## STOUDENMEIER *vs.* WILLIAMSON.

[ACTION TO RECOVER DAMAGES FOR BREACH OF WARRANTY OF SOUNDNESS OF SLAVE.]

1. *Cross-examination of witness.*—On cross-examination greater latitude is allowed than on the direct examination, and much must be left to the enlightened discretion of the presiding judge; nor will the appellate court revise his action, unless the record affirmatively shows that improper indulgence was granted, or unless the cross-examination seeks to elicit facts which are palpably irrelevant and immaterial.

2. *Relevancy of evidence, on cross-examination, showing witness' connection with cause of action.*—In an action on a written warranty of the soundness of a slave, the auctioneer by whom the sale was made was introduced as a witness by the defendant, and was asked, on cross-examination, if the question was not asked, during the sale, whether the slave was sound, and what his reply was; to which he answered, that the question was asked, and that he replied, "I believe she is sound—she is so far as I know,"—*held*, that the question and answer, though they would not have been admissible on the direct examination, were properly received in evidence, as showing the witness' connection with the question of the slave's soundness.

3. *Books of science admissible evidence.*—Standard medical books, in connection with proper explanation of the technical terms used, may be read in evidence to the jury.

4. *Consideration and validity of contract.*—A warranty of the soundness of a slave, given by the vendor to induce the purchaser to comply with the terms of a contract of sale made on a previous day, when it was distinctly announced that no warranty would be given, is founded on a sufficient consideration.

5. *Warranty of administrator binds him personally.*—An administrator, in selling the slaves belonging to his intestate's estate, may warrant their soundness, and thus bind himself personally.

6. *Measure of damages for breach of warranty of soundness.*—In an action on a warranty of the soundness of a slave, the measure of damages is, the differ-

ence between the actual value of the slave at the time of the sale, and what would have been his value if sound, together with interest on this amount from the time of the sale.

APPEAL from the Circuit Court of Montgomery.
Tried before the Hon. EDMUND W. PETTUS.

THIS action was brought by Arthur F. Williamson against Louis Stoudenmeier, and was founded on the defendant's written warranty of the soundness of a slave. On the trial, as appears from the bill of exceptions, the plaintiff offered evidence, conducing to show that said slave, at the time of the sale, was affected with a venereal disease; and introduced two physicians as witnesses, to prove the nature and symptoms of the disease in its various stages. The testimony of one of these physicians tended to prove that the slave had the disease at the time of the sale, while that of the other tended to show that she contracted it afterwards; and the latter further testified, that the slave, some ten or fifteen days after the sale, was delivered of a child, which soon afterwards had symptoms of the same disease in its primary form, and died. On cross-examination of this witness, " the defendant proved, that the old negro woman, who acted as midwife at the birth of the child, had the same disease, in its secondary or tertiary stage, and that it was possible both the child and its mother might have taken the disease from the old woman. To show that the disease, when in its secondary or tertiary form, could not be communicated from one person to another by contact, the plaintiff then offered as evidence an extract from a medical book, written by William Acton, and entitled, ' A Complete Practical Treatise on Venereal Diseases.' The defendant admitted that said book is a standard work in the medical profession, and that it was high authority in that profession on the subjects of which it treats ; but objected to the extract as evidence in this case. The court overruled the objection, and permitted the extract to be read : and the defendant excepted. At the time this extract was offered by the plaintiff, no physician was examined to explain said extract, or in connection with it ; but two physicians had been previously examined by the plaintiff, and had testified

as to the symptoms, nature and appearance of said disease, and the terms used in describing its different stages."

The defendant introduced as a witness the auctioneer who made the sale, and who testified, " that the defendant was the administrator of the estate of Luke Huffman, deceased, and as such administrator authorized witness to sell said slave, with others, at auction ; that witness publicly proclaimed, at the sale, that the slaves were sold by the defendant as administrator, that he would not warrant the title or the soundness of the slaves, and that every purchaser must bid on his own judgment ; that witness made this proclamation at the defendant's request ; that one Shelby was the highest bidder for said slaves, and they were knocked off to him. On cross-examination of this witness, plaintiff's attorney asked him, if he had not been asked, at the time he was selling said slaves, whether this slave was sound ; and he answered, that the question was asked. He was then asked, ' Was was your reply'? to which the defendant objected. The court overruled the objection, and the question was put ; and the witness answered, that his reply was, ' I believe she is sound,—she is sound so far as I know.' The defendant moved to exclude this answer from the jury ; his motion was overruled, and he excepted. The witness said, that he did not make this declaration by the defendant's authority, but that the defendant was present at the time.

" It was further in evidence, that said slaves were sold on a credit of twelve months, and notes with approved security were required ; that said Shelby did not comply with his bid, but it was agreed between him, plaintiff and defendant, after said slave had been knocked off to him, that plaintiff should be substituted to the bid in his place ; that plaintiff and defendant, on the day after the sale, went into an attorney's office, with the bill of sale, which was not then signed ; that said attorney was defendant's legal adviser in all matters connected with the management of said estate ; that he examined said bill of sale, and told defendant that he should not sign it, with his consent,—that if he did sign it, the estate would not be bound by the warranty, but he individually would be bound. Said attorney testified, that he was at that time busy writing a deed; that defendant said, he was confi-

dent the slaves were sound ; that plaintiff said, he believed the slaves were sound, but he had once been bit by buying a slave at an administrator's sale ; that plaintiff said, the bill of sale was in the usual form, or that it was a mere form, (witness could not say positively which of the two expressions was used, but his best impression was that it was the latter,) that plaintiff and defendant then walked off together ; and further, that he had previously advised the defendant, that he would be personally liable on the warranty, if he signed such a bill of sale. It was further shown, that defendant called on plaintiff, about a year or more after said sale, to collect the money on the notes for the purchase money ; that plaintiff then refused to pay, and said to defendant, ' You know I refused to take the slaves unless you warranted them, and that you gave me a bill of sale warranting the slaves'; to which defendant replied, ' Such is the fact, but I did it through ignorance, and it is hard that I should lose it.' "

On this evidence the court charged the jury as follows :

" 1. That if they believed from the evidence that the slave was sold by the defendant, as administrator, at public outcry, to the highest bidder ; and that it was publicly proclaimed, at the sale, by the auctioneer, that the defendant was selling the slaves as administrator, and that he would not warrant any of them ; and that said slave was knocked off, at the sale, to said Shelby, as the highest bidder ; and that Shelby did not comply with his bid, but it was agreed between him and plaintiff, with the consent of defendant, that plaintiff should be substituted to said Shelby's bid ; and that plaintiff, on the next day, before the slaves were delivered, or the notes for the purchase money given, refused to comply with Shelby's bid, unless defendant would give him a bill of sale warranting the soundness of the slaves ; and that defendant, without any fraud or misrepresentation being made by plaintiff, but to induce plaintiff to give his notes for the amount of Shelby's bid, gave the bill of sale which was read in evidence,—then the warranty of soundness contained in said bill of sale is binding on defendant."

" 2. That if, under the charges given, they found for the plaintiff, the measure of damages was, the difference between the sum which the slave was actually worth at the time of

the sale, and the sum which she would have been worth at that time if sound, with interest on that sum from the day of the sale."

The defendant excepted to each of these charges, and requested the court to give the following charges :—

" 1. That if the jury believed that a warranty of said slaves formed no inducement to Shelby to make the bid at which they were knocked off to him, and no inducement to plaintiff in becoming substituted to Shelby's bid, then plaintiff was bound in law to receive the slaves, and to pay for them, without a warranty, or to pay damages to defendant for his failure to do so ; and being so bound, if he afterwards obtained the warranty from defendant by refusing to comply with the terms of sale unless defendant would give it, then the defendant is not liable on said warranty."

" 2. That the extract from the medical book, which was read to them, was not evidence to prove any fact in the case."

The court refused these charges, and the defendant excepted to each refusal ; and he now assigns as error the rulings on the evidence, the charges given, and the refusal to give the charges asked.

WM. H. NORTHINGTON and ELMORE & YANCEY, for the appellant.—1. Medical books, and other books of science, are not admissible evidence before a jury.—1 Greenl. Ev. § 440 ; Collier v. Simpson, 5 Car. & P. 73.

2. The remarks of the auctioneer, while selling the negro, that he believed she was sound, not being made by the authority of the administrator, and being out of the scope of his agency, ought not to have been admitted as evidence.— 1 Greenl. Ev. § 114. The declaration was also irrelevant, because it did not amount to a warranty.

3. The first charge of the court was erroneous. It implied that a warranty, made after the sale, is good ; the only inducement being that the purchaser would comply with the terms of sale. A new consideration is necessary to support such a warranty.—Towell v. Gatewood, 2 Scammon, 22; 5 Vermont R. 28. A contract for the sale of goods, when nothing is to be done by the seller before delivery, transfers the right of property to the purchaser, though the price be not paid,

5 Denio, 379. If an administrator's sale be regular, and there be neither fraud nor warranty, the purchaser is bound to pay his bid.—Mellon v. Boardman, 13 Smedes &. Mar. 100. At common law, if a bidder fails to comply with the terms of sale, the owner can resell, and sue for damages.— 2 Rich. 464. If, therefore, the bidder was bound to give his notes for the slaves, a warranty given by the administrator to induce him to do this, is without consideration, and consequently void.

4. If this were a claim against the estate of the intestate, the written warranty of the defendant is not binding on him in this action, which seeks to charge him personally.—6 Ala. 415 ; 7 Term R. 346.

WATTS, JUDGE & JACKSON, *contra*.—1. The declarations of the auctioneer were properly admitted.—Story on Agency, §§ 154–6 ; Wright v. Beck, at the last term, and authorities there cited.

2. A warranty is supported by sufficient consideration, if made before the consummation of the contract.—Chitty on Contracts, 458.

3. An administrator may bind himself personally.—Craddock v. Stewart, 6 Ala. 77.

4. The extract from the medical treatise was proper evidence to go to the jury. The book was admitted to be of high authority amongst physicians,—a standard work. The terms used in the extract, and the symptoms of the different stages of the disease, had been explained. The only objection which can be urged against the admission of such evidence, is that it is not under oath, and that the opposite party has no opportunity to cross-examine. But the rule on which this objection is founded, is not universal. Books of history are allowed to be introduced as evidence. The digest of the laws of another State, if it purports to be published by authority, is received without any other proof. Books of philosophy, explaining the general principles of science, are introduced without proof. It is an every-day practice to permit men of skill, physicians and others, to give their opinions, and to refer to medical books for the principles on which they base their opinions. Why may not the book,

which constitutes the source of his opinion, be received as an instrument of evidence? In the case of Collier v. Simpson, cited for appellant, the witness was permitted to refer to the books. A standard medical book is the collected experience of the scientific men of all ages, and is worth more than the experience of a single individual.—Guy on Forensic Medicine, 11, 20 ; Beck's Medical Jurisprudence, 699–700. A · standard medical work must be considered equivalent to the sworn testimony of its author. The universal practice in our courts has been to admit such works as evidence. We have found but two decisions on the question in the United States: they are, Bowman v. Woods, 1 Green, (Iowa,) 441 ; and Luning v. The State, 1 Chandler, (Wisconsin,) 178.

STONE, J.—In the case of Lawrence v. Barker, 5 Wend. 305, Ch. J. Savage admitted " there may be cases [on cross-examination] in which great latitude of examination may be permitted, arising from the disposition, temper and conduct of the witnesses, which can be regulated only by the direction of the court, and for which it is difficult to lay down a precise rule."

Thomas v. David, 7 Car. & Payne, 350, is a strong authority in favor of the proposition, that in cross-examination, it is legitimate to inquire into the relations which a witness sustains to the party in whose favor he testifies.

Mr. Greenleaf, in his treatise on Evidence, vol. 1, §§ 446–7–8–9, lays down the rule, that on cross-examination, it is lawful to elicit facts showing "the situation of the witness with respect to the parties and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony, the manner in which he has used those means, his powers of discernment, memory and description." He further adds, that testimony as to collateral facts will be excluded, *except on cross-examination.* See, also, Cameron v. Montgomery, 13 Serg. & Rawle, 132.

The above rules certainly open a very wide area for exploration. They are, however, well fortified by authority, and, we think, commend themselves to every experienced practitioner. In the very nature of things, much must be left to

the enlightened discretion of the presiding judge, who, by observing the conduct and demeanor of the witness, is much better qualified than we can be, to prescribe in each case the boundary of collateral facts, within which to restrict the investigation. We will not say that cases may not arise, in which the primary court may transcend the proper limits. We are satisfied, however, that unless the cross- examination seeks to elicit facts which are palpably irrelevant and immaterial, or unless the record affirmatively shows that improper indulgence was granted in the given case, it is our duty to leave the question to the discretion of the presiding judge.

This was an action on a written warranty of the soundness of a slave. The testimony called out against the objection of appellant, consisted of declarations made by the witness, who was the auctioneer, while making the sale. These could not be received as evidence of a warranty. All previous negotiations had been merged in the written contract.— Melton v. Watkins, 24 Ala. 436; Gordon v. Phillips, 13 Ala. 567 ; Seay v. Marks, 23 Ala. 532 ; Chapman v. Lathrop, 6 Cowen, 109. Neither was it permissible, in this action on the contract, to give evidence of any fraud practiced in the sale by the vendor or his agent, for the purpose of sustaining the action. If this evidence had been offered on a direct examination, we think it should have been excluded. The question, however, assumes a very different character, when it is called out on cross-examination. It certainly tended to show that the witness, in making the sale, had somewhat connected himself with the question of the soundness of the slave; and we think the proof was allowable, as one circumstance to be considered by the jury in weighing his evidence. See Thomason v. Dill, at the present term.

The question, whether the medical treatise offered in evidence by plaintiff, was proper testimony to go before the jury, has not before been made in this court; nor does it appear to have been much considered, either in England, or in any of the courts of this country. Very few adjudged cases can be found in the books ; and those cases are not very satisfactory. Greenleaf, vol. 1, § 440, note 5, is an authority against the admissibility of the evidence. The only authority he cites to sustain the principle, is Collier v. Simpson, 5 Car. & Payne,

73. That was a case at *nisi-prius*, and passed off with little
or no examination.

In the case of the Attorney-General v. The Glass Plate
Company, 1 Anstr. 39, the question was on the proper con-
struction of the word "square," as found in an act of
parliament. The court held, that the construction of the
statute was a question of law, with which the jury had
nothing to do, and hence it was improper to read books to
the jury to explain this term of art found in the act. The
chief baron, in delivering the opinion of the court, said, that
to allow the evidence would be to make the construction "a
question of fact, in place of a question of law." He pro-
ceeded, however, to remark, that a judge "may well inform
himself from dictionaries or books on the particular subject,
concerning the meaning of any word." It will be seen that
this is not an authority against the admissibility of books of
science in evidence before the jury. It simply decided, that
the construction of a statute could not properly go before the
jury. It is pursuasive to show that books may be consulted
on questions affecting any particular art or science.

A question, kindred to this, seems to have been considered
in Green v. Aspinwall, 1 City Hall Recorder, 11. We have
not had access to the volume referred to, and are indebted
for a statement of the principle decided to the Notes to
Phillipps on Evidence, (3d edition,) part II, p. 271. In that
case, the question was, the situation of the tide at a given
time and place. Books treating of the subject were admitted
in evidence. This was also a case at *nisi-prius*.

The case of Harmer's Lessee v. Morris & Gwynne,
1 McLean, 46, is not an authority on this point. That was
nothing more nor less than the familiar principle of proving
a statement previously made by a witness, as having some
bearing on his testimony.

The case of Luning v. The State of Wisconsin, 1 Chandler,
178, is a very loose opinion ; holding that it is discretionary
with the primary court to receive or reject medical or scien-
tific books.

The case of Bowman v. Woods, 1 Green's (Iowa) Rep. 441,
is an authority on the precise point we are now considering.
In that case the court say, "The opinions of an author, as

Stoudenmeier v. Williamson,

contained in his works, we regard as better evidence than the mere statement of those opinions by a witness, who testifies as to his recollection of them from former reading. Is not the latter *secondary* to the former?" In this case the evidence was held to be competent.

We think that medical authors, whose books are admitted or proven to be standard works with that profession, ought to be received in evidence. Should such works be obscure to the uninitiated, or should they contain technicalities, or phrases not understood by the common public, proper explanation should be offered, lest the jury be thereby misled. That was done in this case. The opinions of physicians, as experts, touching disease and the science of medicine, are, under all the authorities, admissible in evidence. If we lay down a rule which will exclude from the jury all evidence on questions of science and art, except to the extent that the witness has himself *discovered* or *demonstrated* the correctness of what he testifies to, we certainly restrict the inquiry to very narrow limits. The brief period of human life will not allow one man, from actual observation and experience, to acquire a complete knowledge of the human system, and its diseases. Professional knowledge is, in a great degree, derived from the books of the particular profession. In every step the practitioner takes, he is, perhaps, somewhat guided by the opinions of his predecessors. His own scientific knowledge is, from the necessities of the case, materially formed and moulded by the experience and learning of others. Indeed, much of the knowledge we have upon all subjects, except objects of sense, is derived from books and our associations with men.

It is the boast of this age of advancing civilization, that, aided and facilitated by the printer's art, the collected learning of past ages has been transmitted to us. Shall we withhold the benefits of this heritage from the contests of the court-room? We think not. Evidence drawn from this source being admissible, the question arises, in what form is it to be laid before the jury? Are opinions, derived from the perusal of books, and deposed to by witnesses, safer guides for that body than the books themselves are?

A principle, familiar to every member of the legal profes-

sion, is strongly illustrative of the propriety of admitting the evidence we are considering. The body of our laws, known as the common law, is generally understood to be unwritten. We prove its existence and its principles by reported cases, and standard elementary writers. With what consideration would an objection be entertained, which on this subject denied the right to consult Coke, Bacon, or Blackstone? All these were elementary writers, and yet they are conceded to be of the highest authority. If it be objected that the books above named are not laid before the jury for their considera- tion, but are weighed and expounded by the court, the answer is, that that grows out of the nature of the subject of which they treat.— Under our system, questions of law are exclu- sively for the court, and with them the jury have nothing to do. All inquiries respecting any other science are questions of fact, for decision by the jury. Can that be a sound rule, which, in the determination of a question involved in one science, allows to the trying body the light shed upon it by the writings of its standard authors, and withholds such lights from controversies respecting all other sciences? We think not.—See Attorney-General v. Glass Plate Company, *supra*; also, Inge v. Murphy, 10 Ala. 897.

We have recently considered and settled the legal question growing out of the facts, that the sale in this case was made at public auction, on the distinct announcement that no war- ranty would be given,—that Shelby, the highest bidder, declined to comply with the terms of his purchase, and Williamson was thereupon, by consent, substituted in his stead as purchaser; that Williamson, on the next day, and before he received the property or gave his note for the pur- chase money, required a bill of sale, with warranty of the soundness of the slaves, as a condition precedent to giving his note; and that thereupon, Stoudenmeier, the executor, executed and delivered to Williamson a bill of sale, with warranty of soundness, and Williamson gave his note, and received the slaves. In that case, we held that parties, either before or after the consummation of a contract, may either rescind or modify it, and no other consideration is necessary to support such contract of rescission or modification, than the mutual agreement of the parties.—See Thomason v. Dill, at the present term, and authorities cited.

In the present case, Stoudenmeier had the clear right to stand on the terms of his public sale ; and unless he or his agent was guilty of some fraud in the sale, Shelby, on a suit for that purpose, would have been adjudged to pay the purchase money. If Williamson agreed to assume Shelby's responsibility under the purchase, and on the faith of such agreement Stoudenmeier discharged Shelby from responsibility on his bid, then Williamson became bound to the same extent as Shelby was before him. Stoudenmeier was fully authorized to disregard Williamson's demand of warranty, and commence his suit either against Shelby or Williamson, as the agreement of the latter had or had not wrought a release of the former from his contract. The record shows that Stoudenmeier waived this right, and that he and Williamson, by agreement on the day succeeding the day of public sale, so far modified their contract, as to secure to him (Williamson) a title to the slaves with warranty of soundness. The authorities above cited show that such agreement is upon sufficient consideration, and will be upheld.—Whiteside v. Jennings, 19 Ala. 784.

That a personal representative, in making sale of the effects of a deceased person, may make a warranty, and thus bind himself personally, is settled in this State.—Craddock v. Stewart, 6 Ala. 77.

This view disposes of all the questions raised, either in the evidence or the charge of the court, on the consideration of the bill of sale.

The only remaining question is that in reference to interest. We hold that, in this State, whenever one party has a legal right to recover of another a debt or damages as due at a particular time, he is also entitled to interest as an incident, from the maturity of the demand until the trial, unless some rule of law declare otherwise.—Marshall v. Wood, 16 Ala. 806 ; Foster v. Rodgers, 27 Ala. 602 ; Weaver v. Puryear, 11 Ala. 941. "The rule in this court," says Justice Goldthwaite, in·the case of Rowland v. Shelton, "as to a warranty of soundness, is, that when a slave, from disease, is worth nothing, the purchaser is entitled to recover the actual value of the slave at the time of the purchase, with interest, and such other damages," &c.—25 Ala. 217 ; Willis

37

v. Dudley, 10 Ala. 933 ; Caldwell v. Sawyer, at the present
term.

There is no error in the record, and the judgment is
affirmed.