[No. 10,632.—Department One.]
June 21, 1882.

## THE PEOPLE *v.* GEORGE A. WHEELER.

MURDER—TRIAL—ARGUMENT—READING FROM BOOK ON MEDICAL JURIS-
PRUDENCE.—Upon the trial of an information for murder, the District
Attorney, in his closing argument to the jury, said he would read, "as a
portion of his argument," from a book called "Browne's Medical Jurispru-
dence of Insanity." No testimony had been introduced to show that this
was a recognized work or standard authority, or that it was a scientific
work. The defense objected to said book, or any part thereof, or to any opin-
ion of said alleged writer, on the ground that it had not been established
to be a scientific work, or a standard or recognized authority, and that it
was *incompetent.* The Court overruled the objections, and defense ex-
cepted; and the District Attorney did read from the book various sec-
tions thereof, commenting upon and treating of the subject of insanity,
*and sustaining the prosecution's theory of the case.*
Held: The Court erred in permitting the District Attorney to read the ex-
tracts referred to.
CASES OVERRULED.—*Harvey* v. *State,* 40 Ind. 516, disapproved.

APPEAL from a judgment of conviction and from an order
denying a new trial, and from an order denying a motion in
arrest of judgment, in the Superior Court of the City and
County of San Francisco. FERRAL, J.

*Darwin & Murphy,* for Appellant.

We claim that no well considered criminal case can be
found in which medical books have been admitted in evidence
or been permitted to be read to a jury, in argument or other-
wise, in support of the case of the people, without proof of
their being standard authorities, or by consent of the defend-
ant. (1 Greenl. Ev., Sec. 440 a, p. 487; Redfield, 12th ed.; 2
Bishop Cr. Prac., Sec. 686, p. 380, 2d ed.; Elwell's Med. Juris.,
c. xxiii., p. 331; Whart. Cr. Ev., Sec. 538, p. 437; id., Sec. 407, p.
320; *Commonwealth* v. *Wilson,* 1 Gray (67 Mass.), 338; *Wash-
burn* v. *Cuddihy,* 8 Gray (74 Mass.), 430; *Commonwealth* v.
*Sturtivant,* 117 Mass. 139; *Commonwealth* v. *Brown,* 121 id.
81; *Ashworth* v. *Kittridge,* 12 Cush. (66 Mass.) 194; *Regina*
v. *Crouch,* 1 Cox Cr. Cases, 94; *Regina* v. *Taylor,* 13 id. 77;
*Collier* v. *Simpson,* 5 Carr & P. 74; *Cocks* v. *Purday,* 2 Carr.
& K. 269; *State* v. *O'Brien,* 7 R. I. 336; *Yoe* v. *The People,* 49
Ill. Rep. 412.)

*A. L. Hart*, Attorney General, for Respondent.

It is claimed that it was error for the Court to permit the Assistant District Attorney, in his closing argument, to read from Browne's Medical Jurisprudence of Insanity. The parts read were not presented to the jury as evidence, but were adopted as part of the counsel's argument. The defense was insanity, and some circumstances had been proven with a view of arguing that they were evidences of a diseased mind, and the District Attorney, in his argument, quoted and adopted the reasoning of the learned author upon the subject. Much conflict exists upon the subject of the right of counsel to read from such works, but it is submitted that the weight of authority is on the side of the right of counsel to adopt the reasoning of any author or person in his address to the Court, or jury. (*People* v. *Anderson*, 44 Cal. 65.)

Courts also take judicial notice of the laws of nature, whether those laws be applicable to animate or inanimate objects, to mind or matter; and hence it is not improper in an argument to a Court to read works of science as well as of law, not as establishing facts, but as exhibiting distinct processes of reasoning which the Court or jury, from its own knowledge thus refreshed, is able to pursue. (C. C. P., § 1875, Subd. 8; Whart. Crim. Ev., 538; Wharton on Evidence, 282, 235; *Harvey* v. *State*, 40 Ind. 516; *State* v. *Spencer*, 1 Zab. 208; *Luning* v. *State of Wisconsin*, 1 Chandler, 270; *Legg* v. *Drake*, 1 Ohio St. 286.)

If the defendant desired an instruction from the Court to the effect that such quotations were not evidence, it was his duty to ask for it; and not having asked for it, he can not, in this Court, take advantage of the failure of the Court to so instruct the jury. (*Williams* v. *Hartford Ins. Co.*, 54 Cal. 442.)

McKINSTRY, J.:

This cause was submitted for decision June 5, 1882.

The District Attorney, in his closing argument to the jury, said he would read, "as a portion of his argument," from a book called "Browne's Medical Jurisprudence of Insanity." The bill of exceptions proceeds: "No testimony had been introduced to show that this was a recognized work or standard

authority, or that it was a scientific work. The defense objected to said book, or any part thereof, or to any opinion of said alleged writer, on the ground that it had not been established to be a scientific work, or a standard or recognized authority, and that it was *incompetent.* The Court overruled the objections, and defense then and there duly excepted. And the District Attorney did read from said book various sections thereof, commenting upon and treating of the subject of insanity, *and sustaining the prosecution's theory of the case."*

An expert has sometimes been defined to be a witness who testifies to conclusions from facts, while an ordinary witness testifies only as to facts. Mr. Wharton thinks this definition not sufficiently exact, since no witness called to facts reproduces them precisely as they exist; more or less of inference being mingled with almost every detail of ordinary observations. "The true distinction is this, the non-expert testifies as to a subject-matter readily mastered by the adjudicating tribunal; the expert to conclusions outside of such range. The non-expert gives the result of a process of reasoning familiar to every-day life; the expert gives the result of a process of reasoning which can be mastered only by special scientists." (Criminal Evidence, 404.) Whatever the exact distinction, it is well settled that where the object is to ascertain whether a *supposed case* is to be regarded as indicating *insanity,* only experts in insanity are to be called, since only experts are competent to describe the differentia of insanity scientifically. (Id. 417, cases cited.)

But the question in the particular case "sane or insane," is a question of fact for the jury. The expert is called to assist the jury in reaching a just conclusion; his testimony is necessarily subject to the supervision of the jury. They must determine, not only whether the hypothetical case on which his opinion is based is the case before them, as established by credible testimony, but must consider the reasons he has given for his opinions, and by his whole testimony test his credibility and the correctness of his judgment. Inasmuch as the circumstances on which the jury are to determine the weight to be given the opinion of an expert are more numerous and complicated than those by reference to which

they are to decide on the consideration to be accorded to the statements of a witness with respect to facts, and inferences involved, if any, which are within the reach of those possessed of no special or scientific acquirements, it follows that it is peculiarly important that a defendant charged with crime should be "confronted" by the expert witnesses against him, and that they should be cross-examined in his presence. But where the opinions of a writer as to the presence or absence of insanity, upon facts more or less analogous to those claimed by the prosecution or defense to be established in the case, are permitted to go to the jury, the writer is not sworn or cross-examined at all. Such evidence is equally objectionable, whether introduced by the people or by the defendant. If held admissible, the question of insanity may be tried, not by the testimony, but upon excerpts from works presenting partial views of variant and perhaps contradictory theories. In the case before us, too, there was no evidence that the work from which the District Attorney read "various" sections was a standard authority in the medical profession, or that the author was an *expert*.

Medical books are not admissible as evidence. The contrary was at one time held in Iowa and Alabama. The Iowa decision (*Bowman* v. *Woods*, 1 G. Greene Rep. 445) was based upon the idea that inasmuch as the opinions of medical witnesses are formed in part upon the books they may have read, the books themselves are "better evidence." A reference to what is said hereafter as to the reasons for rejecting such books will point out the fallacy on which the conclusion of the Iowa Court was based. In *Bowman* v. *Woods* it was conceded that the admission of such books is not in conformity to the prevailing decisions. The Alabama case (*Stoudenmeier* v. *Williamson*, 29 Ala. 558) will be hereinafter noticed.

Medical witnesses, as observed by Briand, "do not usurp the functions, but serve to enlighten the conscience of the Judge and jury." The practice is to ask the opinion of the expert, upon a hypothetical state of facts, but not to permit him to quote from books of authority in his profession to fortify his opinion. Against this exclusion of written authorities medical men have protested very vehemently. As long ago as the trial of Spencer Cowper, Doctor Crell remon-

strated with the Bench when it was intimated that the practice of reading from books was improper. In Beck's Medical Jurisprudence (Vol. 2, p. 963), is a citation from an article in the Edinburgh *Medical and Surgical Journal*, where the editors say: " It appears to us no one can follow this advice" (not to read from medical treatises in giving testimony) " without compromising the right and dignity of his profession as well as the force of his evidence, for it would not be difficult to show that medical evidence is little else than a reference to authority." But one of the editors of the Revision of Beck by Gilman shows (Vol. 2, p. 963), that the effect of the rule is not to deprive parties of medical or scientific evidence, but that Tindal's *dictum*, in *Collier* v. *Simpson*, 5 C. & P. 74, opened the door wide enough to satisfy any reasonable man. " You may ask," said that Judge, " the witness whether in the course of his reading he has found this laid down; you may ask him his judgment and *the grounds of it*, which may in some degree, be founded upon books as part of his general knowledge."

A similar rule obtains with respect to a witness called to prove a foreign law; he should state, on his responsibility, what the foreign law is, and not read fragments of a foreign code. (*Cocks* v. *Purday*, 2 Carr. & K. 269.)

But while a witness can not be permitted to read, as independent proof, extracts from books in his department, he may refresh his memory, when giving the conclusions arrived at in his specialty, by turning to standard works. (1 Whart. L. Ev. 438.) And, as we shall see hereafter, it would seem to have been held in Wisconsin that a witness having cited scientific authorities, they may be put in evidence to discredit him.

Quotations from medical books are not admissible as evidence when offered independently, or when read by witnesses. It follows that counsel ought not to be allowed to read such to the jury; *a fortiori* when they are not proved to come from works of standard authority in the profession. A general history may be read from, but this is only to refresh the memory of the Court as to something it is supposed to know. So, under appropriate restrictions, domestic law books are permitted to be read to the jury. The Court can always cor-

cect the counsel as to his law, or the application of it. But the opinions of medical experts are in their nature *facts*, to be established by living witnesses. They can not be proved by hearsay alleged to come from those not present, and not even shown to be competent to express scientific opinions. Nor are they established by the mere statement of counsel.

The full report of *The Queen* v̇. *Crouch*, 1 Cox's Cr. cases, 94, is as follows:

"The prisoner was indicted for the willful murder of his wife, and the defense set up was that of insanity.

"Clarkson, for the prisoner, in his address to the jury, attempted to quote from a work entitled 'Cooper's Surgery,' the author's opinions on the subject.

"Alderson, B., thought that he was not justified in doing so.

"Clarkson—I quote it, my Lord, as embodying the sentiments of one who has studied the subject, and submit that it is admissible in the same way as opinions of scientific men on matters appertaining to foreign law may be given in evidence.

"Alderson, B.—I should not allow you to read a work on *foreign* law. Any person who was properly conversant with it might be examined, but then he adds his own personal knowledge and experience to the information he may have derived from books. We must have the evidence of individuals, not their written opinions. We should be *inundated* with books if we were to hold otherwise.

"Clarkson—I shall prove the book to be one of high authority.

"Alderson, B.—But can that mend the matter? You surely cannot contend that you may give the book in *evidence*, and if not, what right have you to quote from it in your address, and do that indirectly which you would not be permitted to do in the ordinary course?

"Clarkson—It was certainly done, my Lord, in *Naughten's case*.

"Alderson, B.—And that shows still more strongly the necessity for a stringent adherence to the rules laid down for our observance. But for the non-interposition of the Judge in that case, you would not probably have thought it necessary to make this struggle now."

And in *Regina* v. *Taylor*, 13 Cox's Cr. Cases, 77, it was

held: "Cases cited in books on medical jurisprudence are not admissible even to form part of an address to the jury." Counsel for defense, in addressing the jury, proposed to read from Taylor's Medical Jurisprudence. Brett, J., said: "This is no evidence in a Court of Justice. It is a mere statement by a medical man of hearsay facts of cases at which he was in all probability not present."

To the same effect are the American cases in which the question is fully considered and decided. In *State* v. *O'Brien*, 7 R. I. 338, the Court said: "The book offered to be read to the jury was not admissible as evidence. No evidence in the nature of parol testimony could properly pass to them, except under the sanction of an oath; and upon this ground books of science are excluded, notwithstanding the opinion of scientific men that they are books of authority and valuable as treatises. Scientific men are permitted to give their opinions as experts, because given under oath, but the books which they write containing them are, for want of such oath, excluded."

The suggestion, that such books may be read "as part of the argument of counsel," did not receive much consideration from Chief Justice Shaw, in *Ashworth* v. *Kittridge*, 12 Cush. 193 (66 Mass.) That distinguished Judge there said: "The Court are of opinion that it was not competent for counsel for the plaintiff, against the objection of the other side, to read medical books to the jury. * * * We consider the law to this effect to be well settled, both upon principle and authority. When books are thus offered, *they are, in effect, used as evidence*, and the substantial objection is that they are statements wanting the sanction of an oath; and the statement thus proposed, is made by one not present and not liable to cross-examination. If this same author were cross-examined and asked to state the grounds of his opinion, he might himself alter or modify it, and it would be tested by a comparison with the opinions of others. Medical writers, like writers in other departments of science, have their various and conflicting theories, and often sustain and defend them with ingenuity. But as the whole range of medical literature is not open to persons of common experience, a passage may be found in one book favorable to a particular opinion, when, perhaps, the same opinion may have been

vigorously contested, and, perhaps, triumphantly overthrown by other medical writers, but authors whose works would not be likely to be known to counsel or client, or to Court or jury. Besides, medical science has its own nomenclature, its technical terms and words of art, and also common words used in a peculiar manner, distinct from their received meaning in the general use of the language. From these and other causes, a person not versed in medical literature, though having a good knowledge of the general use of the English language, would be in danger, without an interpreter, of misapprehending the true meaning of the author. Whereas, a medical witness would not only give the fact of his opinion, and the grounds on which it is formed, under the sanction of his oath, but would also state and explain it in language intelligible to men of common experience. If it be said that no books should be read except books of good and established authority, the difficulty at once arises as to the question what constitutes 'good authority;' more especially whether it is a question of competency, to be decided by the Court, whether the particular book shall be received or rejected; or a question of weight of testimony, so that any book may be read, leaving its weight, force, and effect to the jury. Either of these alternatives would be attended with obvious, if not insuperable objections."

And in *Commonwealth* v. *Wilson,* indicted for murder, 1 Gray, 338, the learned Chief Justice also said: "Opinions on the subject of insanity cannot be laid before the jury except under the oath of persons skilled in such matters. Whether stated in the language of the Court or of the counsel in a former case, or cited from the works of legal or medical writers, they are still statements of fact and must be proved on oath."

These views are reaffirmed in *Washburn* v. *Cuddihy,* 8 Gray, 431, and in *Commonwealth* v. *Brown,* 121 Mass., 81. So, also, it was held in *Commonwealth* v. *Sturtivant,* 117 Mass. 139, that an expert should not be allowed to read extracts from a work on medical jurisprudence.

*Dicta* are to be found in the reports of the Courts of several of the States which, disconnected from the context, would seem to support the proposition that counsel may be permitted

to read from medical works of established credit in the profession "as part of his argument." But in one only of the cases, so far as we have been able to find, was it decided that this practice was proper, such decision being necessary to the conclusion reached by the Court.

In *Yoe* v. *People*, 49 Ill. 412, it was said, that where the attorney for The People, against the objection of the prisoner, read copious extracts from medical works, the Court (without special request on the part of the prisoner) should have instructed the jury that such books are not evidence, but theories simply of medical men. Even if we should accept this as law, the judgment in the present case must be reversed, since the Court below did not so instruct the jury. In *Yoe* v. *The People,* the reading of such books by the attorney for the People (in the absence of the instruction mentioned) was held to be error, and the judgment was reversed. In our view the Court came to the proper conclusion—that error had occurred.

But books treating of insanity contain more than abstract speculations or general expositions of the science of medicine as applicable to mental diseases. They contain reported cases and opinions as to the effect to be given to asserted facts in determining the presence or absence of insanity; statements of the views and opinions of their writers, which partake of the nature of facts in the same degree as do the opinions of expert witnesses, who are subject to cross-examination. *Harvey* v. *The State,* 40 Ind. 516, was a case in which it was held not to be error for the trial Court to permit counsel to read from a book purporting to be a medical work, the Court, instructing the jury "that the extract was to be regarded not in anywise as evidence," etc. The objections to the practice so clearly pointed out by Chief Justice Shaw and others do not seem to have occurred to the Judges; and the Court, in *Harvey* v. *The State,* supposed that any evil which might arise from it would be overcome by the direction to the jury to disregard the extract as evidence. In the case at bar, as we have seen, the Court below did not so instruct the jury. It has been held here that ordinarily a judgment will not be reversed because of the omission of the trial Court to give a certain instruction unless the instruction was *requested.* But

the rule certainly would not be applicable to a case in which counsel should be permitted to state *facts* not in evidence to a jury, against the objection of the opposite party. (See *People* v. *Taylor*, 59 Cal. 640.) Here the District Attorney was permitted to read the opinions of one whose opinions (even if we assume the book to be of recognized authority) were, like the opinions of experts upon the witness stand, in the nature of facts.

We do not think *Harvey* v. *The State* was well decided; but if it can be considered law, it will not justify an affirmance of the judgment in the case now before us. In *Legg* v. *Drake*, 1 Ohio St. 286, the bill of exceptions did not show that the passage from Youatt's work on "Veterinary Surgery," which counsel was *prevented* by the Court from reading to the jury, had any relevancy to the cause on trial. The action of the Court below in refusing to permit it to be read, was sustained for this reason; as if the Supreme Court had said: "Assuming that passages from such works may properly be read, they should at least have some bearing on the issue being tried." What is said in the opinion of the propriety of the practice, is mere *dictum* (p. 289). The bill of exceptions before us shows, that the sections read by the District Attorney to the jury, from Browne's work, were relevant. He read "various sections thereof, commenting upon and treating of the subject of insanity, and sustaining the prosecution's theory of *the case*." Moreover, in *Legg* v. *Drake*, the Court only said: "Although unlimited license in range and extent is not allowed to counsel, in their addresses to the Court and jury, yet no pertinent and legitimate process of argumentation, within the appropriate time allowed, should be restricted or prohibited. And it is not to be denied, that a pertinent quotation or extract from a work on science or art, as well as from a classical, historical, or other publication, may, by way of argument, or illustration, be not only admissible, but sometimes highly proper. * * * It would be an abuse of this privilege, however, *to make it the pretense of getting improper matter before the jury as evidence in the cause*." A pertinent quotation, used by way of illustration, is a very different thing from a report of facts connected with a particular case, and the opinion of an author thereon that

they did not indicate or establish insanity; a different thing
from the reading the opinion of a medical writer as to the
effect of particular facts upon the determination of the ques-
tion of insanity. Such must be presumed to have been the
nature of the matters read by the District Attorney in the
present case, since they sustained the prosecution's theory of
" the case"—*this* case. The ruling in *Wade* v. *De Witt* (20
Texas, 401) was based upon a similar bill of exceptions to that
before the Ohio Court, in *Legg* v. *Drake,* and was to the same
effect. In *City of Ripon* v. *Bettel* (30 Wis. 619), the bill of
exceptions did not show for what purpose a certain treatise on
surgery had been admitted. *Non constat,* said the Court, but
a medical expert had stated that the treatise sustained his
conclusion, and the book was admitted as evidence in the na-
ture of impeaching testimony, to show that the witness was
mistaken.

Mr. Bishop, in his work on Criminal Procedure, Section
1190, says: "An expert may testify to what he has learned,
not merely from personal experience and observation, but also
from books, and may give an opinion derived from reading
and study alone. But it does not follow that the books them-
selves are evidence. We have seen that the law of the case
should be given to the jury by the Judge and not through
law books; because the books state the law abstractly,
while the jury are to be instructed upon the rules governing
the particular facts. For the like reason it is the *better doc-*
*trine* that no books of science, or other book of the sort, how-
ever high or well attested its authority, should be submitted
to the jury. Yet equally in the Judge's charge to the jury,
and in the testimony of experts, and even in the arguments
of counsel, passages from *standard books,* explained and ap-
plied to the case in controversy, are, *under limitations vary-*
*ing in some degree in our different courts,* permitted to be
read."

We need not here pause to inquire whether, in view of the
clause in our Constitution which prohibits any charge as to
facts, a California Judge would be permitted to determine
what books are "standard authorities" in the medical pro-
fession; to read from such, and to explain and apply their
contents. With respect to the statement that passages from

standard books may be read by witnesses, and by them explained and applied, "under limitations varying in some degree," the language employed by the very able writer indicates how difficult he found it to derive any definite rule from the instances where such practice had apparently been permitted. The cases cited by Mr. Bishop are *The State* v. *Sartor*, 2 Strobh. 60, and *Merkle* v. *The State*, 37 Ala. 139. In the first it was simply held that, although an indictment for obstructing a highway was at *common law*, it was permissible for the State Solicitor to refer to the public statutes, not to give character to the offense as *against the statute*, but to show what were public ways. 37 Alabama, 139, is based entirely on *Stoudenmeier* v. *Williamson*, 29 Ala. 566, in which the question considered was not whether an expert could read from medical works, but whether such books could themselves be introduced as evidence. In the opinion in the case last named the only English cases cited are *Collier* v. *Simpson*, *supra*, and *Attorney General* v. *The Glass Plate Company*, 1 Anstr. 39.

Of these the first is directly adverse to the proposition that a witness can be allowed to read from scientific treatises; the second—which holds that parol evidence is not admissible to explain the meaning of a word used in an Act of Parliament —is admitted to have no bearing upon the question under consideration. It is further admitted by the learned Alabama Judge that Greenleaf (Vol. 1, Sec. 440, note 5) is an authority against the admissibility of the evidence. Neither the Massachusetts nor Rhode Island cases are mentioned. The American decisions by him referred to are *Bowman* v. *Woods*, already commented on; *Luning* v. *The State of Wisconsin*, 1 Chand. 178, spoken of as "a very loose opinion," and *Green* v. *Cornwell*, 1 City Hall Recorder, 14. In the last, which was a trial by jury in the Mayor's Court of New York city, a table from Blunt's Coast Pilot and Bowditch's Navigator was received to prove the condition of the *tide* at a certain time and place, the presiding Judge saying, "the testimony is of equal validity with the Almanac." But, clearly, *Stoudenmeier* v. *Williamson* is not authority to the point that a witness may fortify his opinion as expert by reading from books, since that question was not decided in that case. There an extract

from a medical book was itself admitted in evidence, and, as Mr. Bishop says, it is now well settled that the books themselves, or extracts from them, are not admissible as evidence.

If the last clause of the above citation from Bishop is to be construed as implying that counsel can *read* to a jury extracts from medical works, and *explain* them, the great weight of authority is decidedly against so dangerous a license.

In *Merkle* v. *The State (supra)* the book read from by the prosecuting attorney was first proved by the testimony of a practicing physician to be a book "recognized by the medical profession as good authority on all subjects therein treated of." The prosecuting attorney did not read from a book, not introduced in evidence nor proved to be authoritative, as was done in the case now before this Court. In *Merkle The State*, the Alamada Court, solely on authority of *Stoudenmeier* v. *Williamson*, held that it was proper to receive such a book in evidence. This ruling is in conflict with the established law on the subject, as stated by Mr. Bishop himself. As to the other cases referred to in the note to the clause quoted from Bishop, some have been hereinbefore mentioned and commented upon, others have no relevancy to the immediate question. *McMath* v. *The State*, 55 Ga. 303, only holds, that, under the supervision and subject to the correction of the Court, counsel may read from books treating of the law of this country.

Our conclusion is that the Court below erred in permitting the District Attorney, in his closing argument to the jury, in the absence of any evidence that the work was of recognized authority in the medical profession, and against the objection of counsel for the defendant, to read from Browne's Medical Jurisprudence of Insanity "various sections treating of the subject of insanity, and sustaining the prosecution's theory of the case."

Judgment and order denying new trial reversed, and cause remanded for a new trial.

Ross, J., concurred.

McKee, J., concurring:

Books of science or art are *prima facie* evidence of facts of general notoriety and interest. But the Court below erred in

permitting the District Attorney, against the objection of the defendant's counsel, to read to the jury extracts, "commenting upon and treating of the subject of insanity," from a book which was not proved to be a recognized or scientific work, or standard authority—was not offered in evidence in the case, nor made part of the testimony of any of the witnesses examined; and on that ground, I concur in the judgment of reversal.