AARON SHUBART, Appellant, v. FEDERATED MINES AND MILLING COMPANY, Respondent.

In the Springfield Court of Appeals, May 2, 1910.

PRINCIPAL AND AGENT: Principal's Right to Recover Commissions Paid Agent by Other Parties. The agent sued his principal for balance due for services under a contract of agency, and for money paid out at instance of defendant. The defendant counterclaimed for $5000 the amount that had been paid the agent by the owners of a mine which had been purchased by defendant. The purchase of the mine had been negotiated by the agent acting for defendant. The evidence is

Shubart v. Mines and Milling Co.

examined and held sufficient to justify a finding that the money had been paid to the agent by the mine owners for his services in making the sale to the defendant, and that it was not a mere gratuity, and that the sale was made when the plaintiff was working for defendant under a contract of agency, notwithstanding the written contract was not signed until later, and that the judgment for defendant for the $5000 on its counterclaim should be sustained.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs, Judge.*

AFFIRMED.

*C. V. Buckley* and *McIndoe & Thurman* for appellant.

*D. C. Mallory* and *Frank L. Forlow* for respondent.

COX, J.—Plaintiff alleges that he was in the employ of defendant from March 1, 1907, to the last day of November, 1907; that among his duties, under said employment, was to buy mining land and leases for defendant, etc. That while so employed, he expended large sums of money at the special instance and request of defendant in looking after their interests, and there was due plaintiff from defendant as salary one thousand three hundred and fifty dollars, and for moneys expended an additional amount sufficient to make a total of $2339.95, for which he asks judgment.

The answer admits the employment and alleges that it was under a written contract which is pleaded, and alleges that plaintiff had agreed to devote his entire time and energies to the sole and exclusive service of defendant, and that plaintiff was to turn over to defendant all options, contracts and agreements, then held by plaintiff, at defendant's option, and further to turn over to defendant all properties at the net cost thereof. Alleged payment of all sums due plaintiff for salary and expenses, and then by way of counterclaim

charged that plaintiff had under his employment purchased for defendant a lease and mine at Alba, Jasper county, known as the "Lelah Mine," and represented to defendant that thirty-five thousand thousand dollars was the least sum it could be purchased for, and induced defendant to buy it at that price, when, in fact, plaintiff had a secret understanding with the owners of the mine that they were to pay him out of the purchase price the sum of five thousand dollars, and that said sum was so paid, and was the property of the defendant, and asked judgment against plaintiff for that amount.

Replication was a general denial.

The case was referred as to the account for services and money expended, and on that phase of the case, the referee found for plaintiff for $742.40 which was approved by the court, and no exceptions taken. The issue as to the counterclaim was tried by the court and he found for defendant for five thousand dollars thereon, then struck the balances and rendered judgment over for defendant for $4257.60, and plaintiff has appealed.

The written contract is dated March 1, 1907, and provides for the employment of plaintiff for thirty days, and thereafter until notice in writing by either party of the termination of such employment. Salary one hundred and fifty dollars per month, and all legitimate expenses. The provisions of the contract material to this controversy are as follows:

"Article 2. Said party of the second part, for and in consideration of the aforesaid compensation, agrees that during the time the said compensation is paid to him he will devote his entire time and energies to the sole and exclusive service of said party of the first part in the transaction of such business as it may direct, and said second party further agrees that during said period he will not engage in mining operations on his own behalf; either directly or indirectly, or in partnership with others."

"Article 3. It is distinctly agreed and understood by the party of the second part that any and all options, contracts and agreements, whether verbal or written, involving the purchase or acquisition of land, leases or mining properties entered into or acquired by said second party during the term of his said services with the first party shall be for the exclusive benefit of said first party in case said first party so elects; and it is further agreed by said second party that the equity of said second party in any of said options, contracts, agreements, lands, leases, or mining properties acquired by said second party which said first party elects to avail itself of, either in whole or in part, shall become the property of the party of the first part by virtue of this agreement; that nothing in this article shall be construed as depriving the party of the first part of the right to reject any or all of said options, contracts, agreements, lands, leases or mining properties."

Article four provides for the payment to plaintiff of a certain per cent of the net earnings of properties that might be bought by plaintiff for defendant.

"Article 8. Said party of the second part agrees to turn over to the party of the first part, all options, contracts, agreements, lands, leases or mining properties, or any or all of them as referred to in article 3 hereof, at net cost price, but should said second party elect to take, either directly or indirectly, a commission or other emolument in connection with said options, contracts, agreements, lands, leases or mining properties, from any party or parties other than the said party of the first part, then, and in that event, said second party agrees to cancel this contract and that his interest therein shall be forfeited, and that any profits thereafter accruing thereunder shall revert to and become the property of the party of the first part."

Plaintiff testified that this contract was not signed until August or September, months after the deal for

143 App—37

the "Lelah Mine" was closed, but he sues for services from March 1st, and there is no evidence to indicate that if this written contract was not in force at the time of the sale of the "Lelah Mine" that he was not serving defendant in the same capacity as that provided for by the written contract, so for the purposes of this case it is immaterial when the contract was signed, for under the pleadings and evidence, the relations of the parties to each other, which was afterward embodied in the written contract, began on March 1st. The evidence tends to show that plaintiff was engaged in buying and selling mining property, and that he had the "Lelah Mine" for sale on commission prior to March 1, 1907, at the price of fifty thousand dollars, and that if sold at that price he was to have ten thousand dollars commission, and that he tried to sell to defendant before entering its employ. When the "Lelah Mine" was sold to defendant, however, plaintiff was at that time in defendant's employ, and testified that in that deal he represented defendant.

Plaintiff now insists that the declarations of law given by the court were erroneous and conflicting and that the finding of the court is against the law and the evidence. Without setting out the instructions, it is sufficient to say that they are more favorable to plaintiff than the testimony warranted, and he cannot now take advantage of his own wrong in inducing the court to give them.

There is really but one question in this case, and that is one of fact. If plaintiff represented defendant in this deal, whether under his written contract or not, he was their trusted agent and was bound to deal openly and fairly with them, and if he represented to them, as the evidence clearly shows that he did, that the mine could not be bought for less than thirty-five thousand dollars, and at the same time had an understanding with the owners of the mine that in case of sale at that price he was to have a commission of five

Shubart v. Mines and Milling Co.

thousand dollars, and concealed that fact from defendant, and, in pursuance of this understanding with the owners of the mine, he afterwards received that sum from them, it was, in equity and good conscience, the money of defendant and should be returned to it, Plaintiff practically concedes this and in his testimony and that of Robinson, one of the mine owners with whom the deal was made, an effort was made to convince the court that the payment of the five thousand dollars to plaintiff by Robinson was after the deal was closed and was a mere gratuity, and not paid as a commission, or for services rendered to the mine owners; but no one can read the testimony of these two men, as preserved in this record, without being convinced at once that the transaction was a fraud upon defendant in the first instance, and the strained effort of these two witnesses to cast a different shade upon the facts can only be characterized as a vain attempt to steer between the treacherous rocks of perjury and the open sea of truth.

On March 18th, the day the contract of sale was made, plaintiff wired defendant "Bought Lelah—total cost thirty-five thousand dollars—must close by first. Send five thousand dollars for escrow. Abstract and details being arranged," and then wrote a long letter in which he stated, "I will forego all details. Suffice it to say that I went at this with sledge hammer blows, and played the New York market against the game;" evidently meaning to impress defendant with the idea that through very great exertion, requiring "sledge hammer blows," he had succeeded in getting the price down to thirty-five thousand dollars. If this were true, it is passing strange that the owners of the mine should be so elated over the magnificent price at which they had disposed of the property that they would, out of mere gratitude, pay plaintiff one-seventh of the entire amount, purely as an expression of thanks for having

dealt them the "sledge hammer blows" in the way plaintiff claims he did.

Robinson testified as follows: "Q. When did you find out you were going to pay him the five thousand dollars? A. I couldn't say exactly. Q. Who fixed the amount? A. I wouldn't say that—whether I fixed it or he fixed it. I gave him a check for five thousand dollars. Q. How did you determine whether it would be $5000 or $10,000 or $15,000? A. Well, just from the amount, that was figured on the $5000 deal."

He further testified as follows: "Q. Were you to get $35,000? A. Yes, sir. Q. How came you to give him $5000? A. Because I think he deserved it. Q. For what? A. Making the deal—reimburse him for the money he had been out; he had been about eight months selling it. Q. In other words, you paid him for selling the property? A. Yes, sir; I gave him $5000. Q. Well, was that a gift, Mr. Robinson? A. Well, I gave it to him, I guess it was a gift." Plaintiff also testified that Mr. Robinson just handed him a check for $5000, and that he was greatly surprised when he did so, and that no conversation passed between them at the time the check was handed to him.

No further comment would seem to be necessary. Suffice it to say that the court found that this money was not paid as a gratuity, but was paid as a commission, and the evidence sustains that finding. This being true, the plaintiff had no right to retain it and the judgment is for the right party, and will be affirmed. All concur.