37 N.J. Super. 295 (1955)
117 A.2d 284
JAMES R. RUTH, ET AL., PLAINTIFFS-RESPONDENTS,
v.
IRVING FENCHEL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 7, 1955.
Decided October 11, 1955.
*299 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Seymour Margulies argued the cause for appellant (Mr. Ezra L. Nolan, attorney; Mr. Maurice C. Brigadier, of counsel; Mr. Margulies, on the brief).
Mr. Eugene T. Sharkey argued the cause for respondents (Mr. John J. Wygant, attorney).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
On May 30, 1953 there was a collision near the intersection of Route 1 and Broadway in Jersey City between the automobiles respectively owned and operated by plaintiff James R. Ruth and defendant Irving Fenchel. Mrs. Ruth and her infant daughter were passengers in the Ruth car; Mrs. Fenchel and her children were riding in the Fenchel car. The Ruths brought suit, Mrs. Ruth and the infant (by her guardian ad litem) demanding damages for personal injuries and Ruth seeking recovery for damages to his car and for damages per quod. Defendant denied negligence and set up the usual defenses of contributory negligence, assumption of risk and joint enterprise. The jury awarded Ruth $1,954, Mrs. Ruth $2,000 and the child $100. Ruth and his wife then moved to set aside the verdict and judgment as to damages only, on the *300 ground that the verdict was inadequate and the result of mistake, partiality, prejudice or passion. The trial court denied the motion as to Ruth, but granted it as to his wife, directing that a new trial be had only as to the damages she had sustained. On the second trial the jury returned a verdict in her favor for $10,000, on which judgment was then entered.
Defendant appeals from the whole of the first judgment, from the order setting aside the verdict in favor of Mrs. Ruth and directing a new trial as to damages only, and from the whole of the second judgment. Defendant contends that (1) the trial court erred in setting aside the first verdict in favor of Mrs. Ruth, since damages was an issue for the jury only and testimony was adduced which, if believed, justified the amount of its award; or, in the alternative, (2) assuming the trial court was correct in setting aside the verdict as to Mrs. Ruth because it was inadequate, the inadequacy was the result of a compromise by the jury on the question of liability, and hence the court should have ordered a new trial on all issues; and (3) the court erred on the retrial in permitting cross-examination of defendant's medical experts by use of medical treatises and other publications which had not been referred to or relied upon by the experts in giving their testimony in chief.
The accident happened before noon; it was raining, the roads were wet, visibility was fair. The Ruth car was proceeding in a westerly direction on Broadway where it approaches an intersection with Route 1. Defendant was driving in a northerly direction on Route 1 and was about to make a right turn into Broadway. There is a center safety aisle on Broadway east of Route 1. It is undisputed that defendant's car, instead of negotiating the turn into Broadway, skidded across Broadway and passed over the safety aisle (defendant says his car passed through an opening in the aisle) and crashed into the left front fender and door of the Ruth car.
Ruth testified that defendant's automobile was travelling at about 50 miles an hour before it went into the skid some *301 40 feet away from the Ruth car. Fenchel and his wife testified that his speed was not more than 25 or 30 miles an hour. Defendant's contention is that the accident was unavoidable; that he had no control because of the skid. This defense, incidentally, was first raised in the course of the trial; it was mentioned in neither the answer nor the pretrial order. However, plaintiff made no objection to the line of evidence defendant sought to develop as to the accident being unavoidable.
The Ruths testified that Mrs. Ruth was sitting in the rear seat of their car with her child lying near her on the seat; that at the moment of collision she was thrown against the side of the car, her right shoulder taking the force of the impact; that when the car richocheted off the curb and was hit a second time by the Fenchel car she was thrown to the floor and struck her head against the rear of the front seat. What happened to Mrs. Ruth on this second contact of the cars is claimed to be the foundation for a so-called "whiplash" injury to her neck. After the accident Mrs. Ruth complained of severe pain in her shoulder, and of a sore neck, back and ankle. She consulted Dr. Felder who had X-rays taken and found that there was a separation of the acromio-clavicular joint, the supporting structure in her right shoulder. He had her carry her right arm in a sling for about three weeks and prescribed heat treatments for the shoulder and neck. In September the neck soreness developed into an increasingly severe pain; she experienced shooting pains in the head, then radiating pain to the shoulder blades, and eventually numbness and tingling in the arms and fingers. Dr. Felder gave her cortisone, but it provided no real relief, so that early in January 1954 he sent her to Dr. Kopell, an orthopedic surgeon, whom he had consulted about the condition from time to time. Kopell had seen Mrs. Ruth in September 1953 and found the separation of the acromio-clavicular joint present. Her complaints then were not primarily those of her shoulder but of her neck and back, and he prescribed a bed board. When he saw her again the following January he found she was suffering from the sequellae of a *302 whiplash injury to the neck and that these sequellae were the cause of her complaints, which were pain and stiffness in the neck, the radiating pains from that area, and numbness and tingling in the hands. He tried injections for a brief period, and then prescribed a cervical spine collar. Mrs. Ruth wore this collar 24 hours a day for a time. The period was gradually reduced; in July 1954 she actually went without the collar. However, the pains soon returned, and she has had to wear the collar eight hours a day, using a soft support for the neck at night.
At the time of the first trial, which was more than 16 months after the accident, Mrs. Ruth was still suffering pain in her neck, shoulders and back, and she had not recovered from her nervousness. During that period she had been in almost continuous pain during her waking hours, and her nights had been disturbed by pain and sleeplessness. From January 1954 on, as noted, her neck required a rigid support during the day and a soft support at night. There were times when her arms and hands were completely numb, and during the entire period she was unable to perform the household duties which she had regularly taken care of prior to the accident, save those requiring very little effort. Even with light household duties, she suffers such pain in her shoulders and back that when she is finished she has to sit down and rest for an hour. If she bends, or walks up the stairs, or stands or sits too long in one position, her back pains her. Her ankle is sore in bad weather.
Both Dr. Felder and Dr. Kopell testified that the separation of the acromio-clavicular joint is a permanent condition, Dr. Kopell stating that the disability is 10% of total. Both causally relate Mrs. Ruth's present condition to the accident. The prognosis is uncertain.
Defendant produced no evidence that plaintiff Ruth was in any way negligent. As to the defense of unavoidable accident, neither defendant nor his wife offered any explanation as to how the car came to skid across the highway. The record is devoid of any proof of an attempt to examine the highway for grease, oil, or some object that may have diverted *303 the car, or to have the car examined to determine what caused it to change its course.
There was only one real conflict in the testimony relating to the accident itself. In contrast to the testimony for the plaintiffs that Mrs. Ruth and her child were in the back seat of the car, the Fenchels said they were in the front seat, and on rebuttal added that there was a carriage in the back seat. The suggestion which the defense probably sought to leave with the jury was that if Mrs. Ruth were indeed sitting in the front seat she could not have been thrown against the side of the car and then onto the floor, and so did not sustain the injuries she claimed. We need not hazard a guess that the jury gained the same impression from the testimony as we do from the record as to the unsatisfactory quality of defendant's testimony as compared with that for the plaintiffs.
The medical testimony was in conflict on the question of causal relation between the accident and Mrs. Ruth's present condition. Defendant's medical expert failed to find a causal connection. He stated that the so-called whiplash injury should manifest itself within 24 hours, and its duration would be a week or two, or at most six to eight weeks. He claimed to have found no indication of such injury when he examined Mrs. Ruth in mid-October 1953. However, his report at that time was that the ankle and neck injuries had healed but Mrs. Ruth "still has residuals of the neck and right shoulder injuries." On cross-examination he claimed that this reference to residual neck injury was a mistake in typing; what was meant was "back" instead of "neck." He also reported, and this was confirmed by him on cross-examination, that the injury to the right shoulder was definitely permanent and that the back injury might subside completely with the passage of time.
Dr. Felder, in contradiction to the testimony of defendant's medical expert, stated that the symptoms of a whiplash injury could appear months after the accident, depending upon the individual, the amount of injury, and the position of the head at the time, and that these symptoms could last for *304 months. Dr. Kopell testified that such injury to the neck could manifest itself at once or as long as one to two years after.
We take note of the fact that following the return of the verdict in the first trial defendant did not move for a new trial under R.R. 4:61-1 et seq. His contention that the inadequacy of the damages found by the jury tainted its finding as to his negligence was raised for the first time on this appeal.
In ruling on the motion for a new trial, the trial judge found that there was no element of compromise in the verdict. He stated he had had the opportunity to observe Mrs. Ruth during the entire trial, and had seen her condition and pain. In setting aside the verdict as to Mrs. Ruth and granting a new trial as to damages only, he said:
"Frankly, I was shocked at the smallness of the verdict. I think $2,000 was too little. I feel that the court has some conscience in this thing. I saw Mrs. Ruth just as well as the jury did. True, the jury has the primary duty of determining the extent of the damages, but the court, under all the rules of court, cannot sit idly by and see them make a mistake as to the damages without acting."
We are aware of the responsibility lodged in a jury to resolve the factual conflict which is invariably present in a negligence case. However, we are also sensitive to the emphasis placed by our Supreme Court in Hartpence v. Grouleff, 15 N.J. 545, 549 (1954), upon the superior position enjoyed by the trial judge over that of the appellate court in deciding "whether justice has been done under the particular circumstances and the weight of the credible evidence," and this because "He sees and hears the witnesses, observes their demeanor and reactions, none of which has life in the record on appeal. He is in a position to know and equate all the factors * * *." We are enjoined not to disturb the action of the trial court, "unless it clearly and unequivocally appears there was a manifest denial of justice under the law." The Appellate Division may not *305 substitute its judgment for that of the trial judge merely because it evaluates the evidence in a light that would justify the jury verdict. Gallichio v. Gumina, 35 N.J. Super. 442, 446-447 (App. Div. 1955)
Accordingly, the determination to grant Mrs. Ruth a new trial as to damages only should not be set aside. There was no contradiction of her condition of debility at the time of the trial. We cannot say there was no rational basis for the conclusion of the trial judge, in the light of his observation of the witnesses, that $2,000 was an inadequate recovery of her damages. In short, it does not clearly and unequivocally appear that there was a manifest denial of justice here.
As for defendant's alternative contention that the amount awarded Mrs. Ruth by the jury should be regarded as having been induced by a compromise as to liability, we find ourselves in complete accord with the trial judge who stated that there was no question in his mind that the verdict was not a compromise. He said that "The jury found, as they could not help but find, that the defendant was negligent." A reading of the record shows that the evidence concerning negligence was so overwhelmingly against defendant that it cannot fairly be considered that the jury compromised the issue of liability in its verdict. There was no conflict in this case as to liability; as the trial court observed, defendant's liability was practically admitted throughout the case. Esposito v. Lazar, 2 N.J. 257 (1949), on which defendant relies, is therefore not in point because, as Justice Ackerson there observed, the question of defendant's liability was sharply contested and at the close of the trial was extremely in doubt. Cf. Capone v. Norton, 8 N.J. 54, 63-64 (1951). The cases are clear that the issue of liability must be in real conflict before the court will find compromise and avoid the entire verdict. Hendrikson v. Koppers Co., Inc., 11 N.J. 600 (1953). There being no real question as to liability, the issues of liability and damages are separable and the new trial was properly limited to damages only. Cf. Capone v. Norton, supra; Rempfer v. Deerfield Packing *306 Corp., 4 N.J. 135, 149 (1950); Paolercio v. Wright, 2 N.J. 412, 417 (1949).
We turn to defendant's argument that the cross-examination of his medical experts was improper. At the retrial defendant presented Doctors Solk and Reilly. We do not have their direct testimony; the appendix reproduces only the cross-examination to which error is laid.
Dr. Solk was cross-examined on his opinion as to when a whiplash injury would manifest itself by symptoms. After stating that he had treated many such injuries in the past 35 years, he said he could not recall a case where the symptoms became evident a month after the accident, although that was a possibility "if the whiplashing or the injury to the spinal column caused an inflammatory process, an inflammation which would result in an arthritis or osteoarthritis," in which case he believed it would more likely be six months before the injury would manifest itself and that the particular condition would be diagnostic upon X-ray visualization. In his experience the longest period of time between a whiplash injury and the onset of pains in the arm was a few hours. Counsel for plaintiffs then asked Dr. Solk if he recognized Key and Conwell's Fractures, Dislocations and Sprains, published in 1946. The witness conceded the medical treatise was a reputable authority in the field. He was then asked to read what the authors said regarding injuries to the cervical spine. Defendant's counsel objected because there was no opportunity afforded to cross-examine the authors, and plaintiffs' counsel then explained that his question was directed to the credibility of the witness. He was allowed to proceed with cross-examination, and the following ensued:
"Q. Does what you have read support your position in respect to the injuries, or the position taken by you with respect to the injuries claimed to the cervical spine, claimed by Mrs. Ruth? A. Whatever I have said, they say in the book. I think that you have a misconception of their understanding, or of understanding what the article goes on to say.
Q. You have not answered.
The Court: Let him answer.
*307 The Witness: They say that you can have a whiplashing injury to the cord, to the cervical spine and the symptoms complained of in some future date.
Q. A two year period is given? A. In `x' number of days, up to a two year period. They said that.
The Court: Do you agree with these gentlemen?
The Witness: Not fully. They also go on to say that she must show, the patient must show some sign or symptoms, as undue pain upon pressure. That I don't believe that you can go along, that for an indefinite period of time after a so-called possible whiplashing of the spine and will turn up `x' number of years later with symptoms of the subluxation or whiplashing injury without having shown some symptoms if they look. I don't believe it is possible.
Q. In other words, you do not agree with that part of the text of Key and Conwell where it is stated that `sometimes the onset of the symptoms of the injury to cervical spine do not show up for as long as two years'? A. I do not agree with what you have said about the article.

* * * * * * * *
Q. What is your recollection of what you just read as to the longest period of time mentioned in this article when the onset of the symptoms may occur? A. I will answer that by having you read the few words that I underlined.

* * * * * * * *
Q. You may read with me: `Many patients present themselves to the physician with the complaint of pain in the neck with or without spasm with variable pain radiation with gradations from those of trivial annoyance to those exhibiting intractable causalgia. The question of injury, whether recent or remote, is frequently slurred over by the patient for the reason that painful symptoms do not develop until some time after, a good many times years after the injury occurs.'"
Further objections to this line of testimony were overruled. The court then interrupted and said:
"At this point, may I say to the jury that any matter that has been read from this authority, from the book, has no probative force as a proven statement of the statements that are made in the book. They are only used for the purpose of cross examination of this witness by counsel for the plaintiff, insofar as it may or may not affect the credibility in your minds as to his opinion; that is the only purpose of the reading from the volume. It is not proof as to the facts of this case, or his opinion. All right; proceed."
Plaintiffs' counsel then asked the witness to read an article entitled "Whiplash Injuries of the Neck," which appeared *308 in the August 29, 1953 issue of the Journal of the American Medical Association describing the sequellae of a whiplash injury. The court, over objection, allowed counsel to read a portion of this article aloud as a basis for further cross-examination, after instructing the jury that "Any expression of opinion or statement in these articles is not to be taken by you as proof of those conditions. It is merely given as to what may or may not affect the witnesses' credibility." After counsel had read from the article, the court sustained a series of objections to questions based thereon.
Dr. Reilly was defendant's second medical expert. Testifying on the basis of "a hundred or two hundred" whiplash injuries he had treated, he said that the symptoms exhibit themselves immediately or within a short time. When asked whether he had read a work on orthopedic sprains by Gay and Abbott, and the treatment they gave the subject of cervical sprain, he said he was acquainted with it and had read it at the time of the first trial. He further stated that it was one of the books in his own library and that it was "an excellent text book." He admitted there was a statement in that text that the symptoms of whiplash injury often do not show up until years after the injury. Asked if he agreed with the statement he said: "I agree in general with the conclusions, but not the whole statement at [as to?] the particular cases."
Any consideration of defendant's challenge to this kind of cross-examination of his medical experts must first take into account the role such experts play in our adversary system. It has been said that nowhere are the inequalities of that system "more glaring than in the field of expert testimony, partly because the expert has become an advocate rather than a witness, and partly because of rules which permit the suppression of important data, which sanction the exclusion of relevant evidence, and which restrict the use of opinion." Morgan, Suggested Remedy for Obstructions to Expert Testimony by Rules of Evidence, 10 U. of Chi. L. Rev. 285, 286 (1943). This outstanding teacher and authority on the law of evidence, who served as Reporter for *309 the American Law Institute's distinguished Committee on Evidence which drafted the Model Code of Evidence (1942), was led to observe that
"* * * the usual expert witness assumes the role not of an impartial specialist but of an ardent advocate of the party who has retained him. In litigation involving personal injuries, death by accident, alleged mental irresponsibility and the like, the medical expert has become a stench in the nostrils of upright judges. * * * Even the generally respected physician and surgeon whose skill is unquestioned frequently shades his testimony to the advantage of the party paying his fee. * * *" Ibid., pages 292-293
Judges have been among the first to recognize the vices which often taint expert testimony. The medical expert who comes into court, "[w]hatever his intentions, * * * will find himself an antagonist in a swift and sometimes ruthless, partisan battle. He is confronted by keen counsel and speedily forced into the realization that the science of testifying is often more valuable than the testimony of science." Smith, Cooperation Between Law and Science in Scientific Proof, 19 Tex. L. Rev. 414, 417 (and note 8), 418 (1941). And see 6 Wigmore on Evidence (3rd ed. 1940), § 1692, p. 6, quoted below; Dana, Admission of Learned Treatises in Evidence, Wisc. L. Rev. 454, 459 (1945).
Most jurisdictions prevent the use of learned treatises, even on cross-examination of expert witnesses, by invoking the hearsay rule. Effective use of recognized medical authority is thus cut off and, in the words of Morgan, important data suppressed and relevant evidence excluded. The side which can afford and is able to produce medical experts of sufficient stature and, perhaps, in greater number, has the distinct advantage.
The general rule, recognized in all states but Alabama, is that medical books and treatises, even though recognized as standard authorities on the subject to which they relate, are not admissible to prove the truth of the statements therein contained. Annotation, 65 A.L.R. 1102 (1930); Morgan, Basic Problems of Evidence (1954), p. 319; 6 Wigmore on Evidence (3rd ed. 1940), § 1696, p. 9, *310 note 1; but see Stoudenmeier v. Williamson, 29 Ala. 558 (Sup. Ct. 1857), the leading case establishing the Alabama rule contra. New Jersey follows the general rule. New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., 59 N.J.L. 189 (E. & A. 1896) (metals expert), where the court quoted 7 Am. & Eng. Encycl. L. 513 and Wharton on Evidence as authority; Lamble v. State, 96 N.J.L. 231 (E. & A. 1921) (fingerprint expert).
There are various shades of opinion whether works of recognized standard authority may be referred to or used in cross-examining an expert witness. The cases fall into two main groups:
(1) Where the medical expert bases his opinion, in part at least, on the authority of standard works, the cases generally support the proposition that counsel may cross-examine him with respect to the authorities for the purpose of showing that he was mistaken, or of otherwise discrediting his testimony. State v. MacRorie, 86 N.J.L. 401 (Sup. Ct. 1914); Lewis v. Johnson, 12 Cal.2d 558, 86 P.2d 99 (Sup. Ct. 1939); Cronk v. Wabash R. Co., 123 Iowa 349, 98 N.W. 884 (Sup. Ct. 1904); Stout v. Bowers, 97 Kan. 33, 154 P. 259 (Sup. Ct. 1916); Travelers' Ins. Co. v. Davies, 152 Ky. 600, 153 S.W. 956 (Ct. App. 1913); Ruud v. Hendrickson, 176 Minn. 138, 222 N.W. 904 (Sup. Ct. 1929); MacDonald v. Metropolitan Street Ry. Co., 219 Mo. 468, 118 S.W. 78 (Sup. Ct. 1909); Winters v. Rance, 125 Neb. 577, 251 N.W. 167 (Sup. Ct. 1933); Laird v. Boston & Maine R.R., 80 N.H. 377, 117 A. 591 (Sup. Ct. 1922); Scott v. Astoria R. Co., 43 Or. 26, 72 P. 594, 62 L.R.A. 543 (Sup. Ct. 1903); Bruins v. Brandon Canning Co., 216 Wis. 387, 257 N.W. 35 (Sup. Ct. 1934). The principle has been applied even where the witness referred to no specific work. State v. Brunette, 28 N.D. 539, 150 N.W. 271 (Sup. Ct. 1914); Baldwin v. Gaines, 92 Vt. 61, 102 A. 338 (Sup. Ct. 1917); where there was a general reliance on medical works, Clark v. Commonwealth, 111 Ky. 443, 63 S.W. 740 (Ct. App. 1901); or where the reliance was of only an indirect type, e.g., where the witness stated the usual practice of ordinary skilled members *311 of the community, Ruud v. Hendrickson, supra, or described the accepted method of treatment expressed by medical authorities, Wittenberg v. Onsgard, 78 Minn. 342, 81 N.W. 14, 47 L.R.A. 141 (Sup. Ct. 1899). The practice has also been allowed where the fact that the witness is relying upon the particular authorities was first brought out on cross-examination, Wilcox v. International Harvester Co., 278 Ill. 465, 116 N.E. 151 (Sup. Ct. 1917), affirming 198 Ill. App. 33 (1916); Pinney v. Cahill, 48 Mich. 584, 12 N.W. 862 (Sup. Ct. 1882).
(2) Where the expert does not purport to base his opinion on recognized medical works, the authorities are divided on the proposition of whether counsel may refer to or use standard texts in cross-examining him. In State v. MacRorie, supra (86 N.J.L., at page 405), our former Supreme Court held such cross-examination improper:
"It is only when a witness refers to [medical works] as an authority for his own opinions that they are receivable in evidence, and then only for the purpose of contradicting him."
The Third Circuit followed this as expressing the New Jersey rule in Western Union Teleg. Co. v. Ammann, 296 F. 453 (1924), and E.I. du Pont de Nemours & Co. v. White, 8 F.2d 5 (1925). Accord: Gluckstein v. Lipsett, 93 Cal. App.2d 391, 209 P.2d 98 (Ct. App. 1949), criticized in 23 S. Cal. L. Rev. 403 (1950); Denver City Tramway Co. v. Gawley, 23 Colo. App. 332, 129 P. 258 (Ct. App. 1912); Ullrich v. Chicago City Ry. Co., 265 Ill. 338, 106 N.E. 828 (Sup. Ct. 1914); State v. Blackburn, 136 Iowa 743, 114 N.W. 531 (Sup. Ct. 1908); Commonwealth v. Jordan, 207 Mass. 259, 93 N.E. 809 (Sup. Jud. Ct. 1911), affirmed without considering the point, 225 U.S. 167, 32 S.Ct. 651, 56 L.Ed. 1038 (1912); Hall v. Murdock, 114 Mich. 233, 72 N.W. 150 (Sup. Ct. 1897); State v. Brunette, supra; Mitchell v. Leech, 69 S.C. 413, 48 S.E. 290, 66 L.R.A. 723 (Sup. Ct. 1904); Baldwin v. Gaines, supra.
Many courts, however, have allowed such cross-examination, wholly apart from any reliance by the witness on the medical *312 authorities with which counsel confronted him. Such cross-examination has been considered proper, within reasonable limits, as testing the knowledge and accuracy of the expert. A leading case, but by no means the first to so hold, is Laird v. Boston & Maine R.R., 80 N.H. 377, 117 A. 591 (Sup. Ct. 1922). The United States Supreme Court adopted this view in Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949), and see case note in 24 Tul. L. Rev. 358 (1950). See also Victor American Fuel Co. v. Tomljanovich, 232 F. 662 (1st Cir. 1916), certiorari denied 242 U.S. 643, 37 S.Ct. 212, 61 L.Ed. 542 (1916); Barfield v. South Highlands Infirmary, 191 Ala. 553, 68 So. 30 (Sup. Ct. 1915); Scullin v. Vining, 127 Ark. 124, 191 S.W. 924 (Sup. Ct. 1917); Osborn v. Cary, 28 Idaho 89, 152 P. 473 (Sup. Ct. 1915); Hess v. Lowrey, 122 Ind. 225, 23 N.E. 156, 7 L.R.A. 90 (Sup. Ct. 1890); Ruud v. Hendrickson, supra; Ganz v. Metropolitan Street Ry. Co., 220 S.W. 490 (Mo. Sup. Ct. 1920); Egan v. Dry Dock, E.B. & B.R. Co., 12 App. Div. 556, 42 N.Y.S. 188 (App. Div. 1896); People v. Feldman, 299 N.Y. 153, 85 N.E.2d 913 (Ct. App. 1949); Kern v. Pullen, 138 Or. 222, 6 P.2d 224, 82 A.L.R. 434 (Sup. Ct. 1931); Sale v. Eichberg, 105 Tenn. 333, 59 S.W. 1020, 52 L.R.A. 894 (Sup. Ct. 1900); Hicks v. Brown, 128 S.W.2d 884 (Tex. Civ. App. 1939); Cameron v. Benefit Ass'n of Ry. Employees, 6 Wash.2d 440, 107 P.2d 1096 (Sup. Ct. 1940).
Generally, as to the use of medical books or treatises in cross-examining an expert witness, see Annotation, 82 A.L.R. 440 (1933); 6 Wigmore on Evidence (3rd ed. 1940), § 1700, p. 17 ff.
The objections to permitting a recognized medical work to be used in the examination of a medical witness, except in the limited situation where he has directly relied upon it, were stated in a number of early cases which later decisions proceeded to follow with little or no analysis of the validity of their underlying reasoning. As to these objections and their refutation, see 6 Wigmore, op. cit., § 1690, p. 2 ff.; Dana, Admission of Learned Treatises in Evidence, Wisc. L. *313 Rev. 455 (1945); Annotation, 65 A.L.R. 1102, 1104. Cf. Grubb, A Code of Evidence for Wisconsin?  Proposed "Learned Treatises" Rule, Wisc. L. Rev. 81 (1946).
(1) The main reason given is that such a medical work is pure hearsay; there is no opportunity to cross-examine the author. Ware v. Ware, 8 Me. 42, 56 (Sup. Jud. Ct. 1831); Ashworth v. Kittridge, 12 Cush. 193, 194 (Mass. Sup. Jud. Ct. 1853). But the writer has no motive to misrepresent. He may have bias in favor of a certain theory, but it is a bias in favor of the truth as he sees it. He has not written with a view to litigation or the interests of a particular suit, nor has he been called and paid by one or the other party, so that there is absent that partisanship, however unconscious, so often found in an expert witness which calls for an opportunity to cross-examine.
The writer of a medical treatise publishes primarily for the profession. It is a reasonable assumption that he will not attempt to withhold information or falsify, for he knows that his work will be subject to the critical appraisal of his profession and will surely be refuted if not well-founded. Nothing less than his reputation is at stake should his data be incorrect or his conclusions invalid. His fellow-practitioners will soon enough judge of his sincerity and accuracy.
As Wigmore observes,
"* * * the probabilities of accuracy, such as they are, at least are greater than those which accompany the testimony of so many expert witnesses on the stand. The abuses of expert testimony, arising from the fact that such witnesses are too often in effect paid to take a partisan view and are practically untrustworthy, are too well-known to repeat * * *. It must be conceded that those who write with no view to litigation are at least as trustworthy, though unsworn and unexamined, as perhaps the greater portion of those who take the stand for a fee from one of the litigants." 6 Wigmore on Evidence (3rd ed. 1940), § 1692, p. 6.
In short, the nature of the writings, put forth by men of science and learning for the sole purpose of passing their knowledge and their theories on to those of the profession, is in itself a sufficient guaranty of the trustworthiness of the author. The lack of the sanction of an oath, or of an opportunity *314 to cross-examine, is no valid reason for barring his scholarship and authority from the courtroom.
The further observation may be made that every medical expert, in formulating his opinion, relies not only upon his own experience, but invariably also on a considerable body of literature on the subject which he has read or heard discussed  authorities not mentioned in his testimony and often but dimly remembered. To the extent that he so relies on the literature in the field, his stated opinion is infected with hearsay. And yet his opinion is readily admitted in evidence, while medical texts, the most authoritative and recent, are not. See Laird v. Boston & Maine R.R., supra, 80 N.H. 377, 117 A. 591 (Sup. Ct. 1922). The logic of such a disparate approach escapes us. Since, by permitting an expert to state his opinion, there is brought into the case the extent of his knowledge of the literature on the subject, it is proper that he be cross-examined as to that knowledge.
(2) The treatise may be used unfairly, by selecting isolated passages which are explained away or contradicted in other works, or indeed in other parts of the same book. Gallagher v. Market Street R. Co., 67 Cal. 13, 16, 6 P. 869 (Sup. Ct. 1885). This objection should readily be overcome by the adversary system of lawsuits, particularly if, as noted below, information is elicited or obtained in advance as to the texts to be relied upon. Opposing counsel can see to it that the writer's views are fully stated if use is made of misleading passages, or that other works are brought to the attention of the judge and jury on redirect examination of his own expert. It cannot be assumed that he will be less diligent in his client's behalf than he would be in bringing an opposing expert to the stand  and he could accomplish this with far less difficulty and expense. As to the role of the court in seeing to it that the passages used are a fair selection, see Connecticut Mutual Life Ins. Co. v. Ellis, 89 Ill. 516 (Sup. Ct. 1878); In re Hock's Will, 74 Misc. 15, 129 N.Y.S. 196 (Sur. Ct. 1911).
(3) Changes in scientific knowledge may make the authority outmoded; science is constantly shifting, testimony *315 characterized by such instability and uncertainty is untrustworthy. Ware v. Ware, supra (8 Me., at page 57); Ashworth v. Kittridge, supra (12 Cush., at page 195); Gallagher v. Market Street R. Co., supra (67 Cal., at page 16, 36 P. 869); People v. Hall, 48 Mich. 482, 490, 12 N.W. 665 (Sup. Ct. 1882). Wigmore (op. cit., § 1690, p. 3) points out that such charges attribute to the entire body of scientific knowledge an instability due to progress in only certain departments, and even in the latter the change is of small proportion to the large area of established truth. If the criticism so directed has validity, then it must be equally applicable to specialist witnesses in general, very few of whom have a thorough acquaintance with the latest researches in their field. Many undoubtedly testify on the basis of information obtained in graduate school or hospital or from books published years ago, "but could it seriously occur to any one to exclude all experts from the stand, not because this or that one has in fact no acquaintance with the recent literature of his profession, but because many among the whole body may not possess such acquaintance?"
For practical purposes, uncertain topics are the exception and not the rule. There is, in fact, no such appreciable area of conflict in scientific beliefs and knowledge that a court must take notice of it, to the exclusion of recognized learned treatises.
Here, again, it is not to be assumed that opposing counsel, or perhaps the court itself in the exercise of its supervisory function, will not be alert to the introduction of a dated authority. In any circumstance, the medical work must be shown to be a recognized authority before it can be used. An author whose writings or theories have been superseded is not likely to hurdle the barrier of being recognized as an authority.
(4) The danger of confusing the jury; as laymen they may not understand the technical language of the treatise. Ashworth v. Kittridge, supra (12 Cush., at page 195). True, scientific works, and especially medical works, are written for students and the profession and suppose a *316 certain knowledge and background on the part of the reader. Their language is technical, special, and often unintelligible to the average man. But opposing counsel can be trusted to have the meaning made clear, by calling his own expert or eliciting the clarification from the one on the stand. The trial judge may call for the explanation, even as he often does when the testimony of an expert witness is so technical as to escape the understanding of all except the initiate. See Stoudenmeier v. Williamson, 29 Ala. 558 (Sup. Ct. 1857).
(5) Use of medical texts will result in a "battle of the books." Here the court always has control; in the wise exercise of discretion it can keep the contest within reasonable bounds.
We find none of these reasons, first advanced by a few courts in the last century, sound or persuasive, either standing alone or as a group. Courts that bar the use of recognized medical authorities insulate themselves and the cause of justice from the impact of significant and relevant information. As Justice Stone said almost 100 years ago in the Stoudenmeier case, supra:
"* * * The opinions of physicians, as experts, touching disease and the science of medicine, are, under all the authorities, admissible in evidence. If we lay down a rule which will exclude from the jury all evidence on questions of science and art, except to the extent that the witness has himself discovered or demonstrated the correctness of what he testifies to, we certainly restrict the inquiry to very narrow limits. The brief period of human life will not allow one man, from actual observation and experience, to acquire a complete knowledge of the human system, and its diseases. Professional knowledge is, in a great degree, derived from the books of the particular profession. * * *
It is the boast of this age of advancing civilization, that, aided and facilitated by the printer's art, the collected learning of past ages has been transmitted to us. Shall we withhold the benefits of this heritage from the contests of the courtroom? We think not. * * *"
Cf. City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637 (Sup. Ct. 1939), reaffirming the Alabama rule as to the admission of learned treatises and observing that *317 the courts had not found the ends of justice defeated by the rule, nor the difficulties of its application very great. The court quoted from the Stoudenmeier case:
"Under our system, questions of law are exclusively for the court, and with them the jury have nothing to do. All inquiries respecting any other science are questions of fact, for decision by the jury. Can that be a sound rule, which, in the determination of a question involved in one science [law], allows to the trying body the light shed upon it by the writings of its standard authors, and withholds such lights from controversies respecting all other sciences? We think not. * * *"
The need of simplifying and modernizing the common law rules of evidence has been recognized at every hand. Authorities like Thayer, Wigmore and Morgan, including leaders of the bench and bar who worked with the latter in producing the Model Code of Evidence for the American Law Institute, have pointed up the obstructive effect of those rules, which usually operate to exclude relevant evidence of material facts. Although the era of reform in Anglo-Saxon procedure  which began with the English Judicature Acts and culminated in the Federal Rules of Civil and Criminal Procedure and, by common recognition, on the state level, in the Rules Governing the Courts of the State of New Jersey  wrought vast changes, the law of evidence has been left largely untouched. McCormick, Some High Lights of the Uniform Evidence Rules, 33 Tex. L. Rev. 559 (1955). The Model Code of Evidence, completed and published in 1942, was an effort to meet this need of bringing the law of evidence into step with the 20th Century. In 1948 the National Conference of Commissioners on Uniform State Laws determined that the law of evidence was a proper field for uniform legislation. It set up a Special Committee on Uniform Rules of Evidence, whose report was approved by the Commissioners and the American Bar Association in 1953, and by the American Law Institute in 1954. In our own State we have the Report of the Committee on the Revision of the Law of Evidence (May 25, 1955), of which Justice Jacobs of the Supreme Court was chairman.
*318 Rule 529 of the Model Code of Evidence provided that
"A published treatise, periodical or pamphlet on a subject of history, science or art is admissible as tending to prove the truth of a matter stated therein if the judge takes judicial notice, or a witness expert in the subject testifies, that the writer of the statement in the treatise, periodical or pamphlet is recognized in his profession or calling as an expert in the subject."
The rule puts no restriction on the admission of learned treatises recognized as authoritative, for the purpose of independent evidence or cross-examination. Rule 59(29) of the Uniform Rules of Evidence is essentially the same, but omits the words "as tending." Rule 63(31), recommended in the Report of our own Committee on the Revision of the Law of Evidence, excepts from the operation of the hearsay rule
"A published treatise, periodical or pamphlet on a subject of history, science or art to prove the truth of a matter stated therein if the judge takes judicial notice, or a witness expert in the subject testifies, that the treatise, periodical or pamphlet is a reliable authority in the subject."
Such a rule has the support of Wigmore (op. cit. §§ 1690-1692, pp. 2-6), who argues that learned treatises should be admitted in evidence as an exception to the hearsay rule on grounds of necessity (medical experts sometimes are not available to testify or, if available, may not be the most qualified in the field of controversy; they may be beyond the reach of the litigant's pocketbook) and of the trustworthiness of the treatise; and Morgan (Basic Problems of Evidence (1954), p. 319). It has been approved by many of those who have written on the subject. See, for example, Dana, Admission of Learned Treatises in Evidence, Wisc. L. Rev. 455, 462 (1945); McCormick, Some High Lights of the Uniform Evidence Rules, 33 Tex. L. Rev. 559, 567-8 (1955); Comment, 2 U.C.L.A.L. Rev. 252 (1955); but see Grubb, A Code of Evidence for Wisconsin?  Proposed "Learned Treatises" Rule, Wisc. L. Rev. 81 (1946). It has, of course, the approval of the leaders in the field of evidence who drafted the Model Code and the Uniform Rules.
*319 The "learned treatises" rule has not yet been adopted in this State. The former Court of Errors and Appeals barred the use of such treatises in evidence as proof of the opinion they contained, New Jersey Zinc & Iron Co. v. Lehigh Zinc & Iron Co., supra, in 1896, and if that were the question before us we would consider ourselves bound under stare decisis to follow it, although we are in complete disagreement with its holding and note the failure of the court to give any reason for adopting the rule beyond the quite limited citation of authority. The issue here is whether counsel for plaintiff should have been permitted to cross-examine defendant's medical witnesses for the purpose of affecting their credibility by using or referring to authorities on which they had not relied. The decision of the Supreme Court in State v. MacRorie, supra (1914), would answer that question in the negative. It stated the rule as being that the witness must first have relied on the treatise before he could be so cross-examined, and this with little more than a bare exposition of its holding. We cannot agree with the result there achieved and do not consider ourselves bound by it. Our own conviction, supported by the critical analysis that others have brought to the rule, leads us to reject the MacRorie conclusion. We deem it the sounder and more sensible rule that recognized medical works may be used on cross-examination of a medical expert, whether he relied on them directly or indirectly, or not at all, and this for the purpose of testing his knowledge and the accuracy of his opinion.
It is not amiss to refer to the inconsistent position of our own courts in this matter. While rejecting learned treatises as hearsay when attempted to be used by the parties, courts have cited medical works and the like as a foundation of fact for subjects involved in their decisions. Ross v. Marx, 24 N.J. Super. 25 (App. Div. 1952), certification denied 14 N.J. 466 (1954) (medical article on blood grouping); Slonim v. Globe Indemnity Co., 20 N.J. Super. 594 (Law Div. 1952) (insurance publications); State Board of Medical Examiners of New Jersey v. Plager, 118 N.J.L. 434 (Sup. Ct. 1937) (medical works on blood pressure).
*320 The medical treatises which the trial court permitted to be used on cross-examination were vouched for by the experts themselves as reputable authorities. They agreed generally with the portions of the text called to their attention by plaintiffs' counsel. The stated purpose of the cross-examination was to test credibility, and the court, keeping complete control of the situation, particularly instructed the jury that the material read to the experts had no probative force of its own, but was used only for the purpose of affecting their credibility. There was no prejudice to defendant in all this.
This aside, however, we decide the matter on the broader ground that the cross-examination, for the purpose for which it was allowed, was entirely proper.
We have already indicated that for purposes of the application of the rule we adopt, it would generally be the better practice that there be some notice to the adversary of the treatises intended to be used on cross-examination. This information could be made available or elicited at pretrial, by the use of discovery proceedings, or as the court might otherwise direct.
Affirmed.